The next case is State of Brown v. Perry County has been submitted on the briefs. Our final case for argument is Meagher v. Prioleau. Counsel for appellant, please proceed. Good morning, your honors. My name is John Zeldin-Rust and I represent the individually named jail defendants in this case. Gregory Curtis, Rodney Prioleau, and Correctional Officer Garcia. This is an appeal from a district court order denying qualified immunity to these three individuals of the King County Jail. The issue is whether clearly established law would have placed a reasonable correction officer on notice that a failure to go and check an inmate's protected health information in the custody of the medical provider could constitute deliberate indifference on a failure to counsel. All right. I don't think that's the issue. All right. You know, you know, you just referred to our Castro case, right? Yes. And I think that you have been very careful to talk about the fact that the issue on this appeal and this interlocutory appeal is just the existence of the federal right. Yes. Yes. Okay. So we've defined the existence of the federal right under this deliberate indifference standard is if these guards, I'll say guards, um, and that is an unfair summary, but just for the purposes of the question, so we're subjectively aware of a risk that they have to respond, right? Well, your honor, I think under the Kingsley standard, the objective standard, uh, of, of this, uh, that that's been, that's been done with the, uh, with the failure to protect claims. The issue is whether a reasonable officer would have been aware that his conduct or her conduct in the specific circumstances they confronted, uh, would violate an inmate's, uh, right to be, uh, protected from assault, uh, by another inmate under deliberate indifference standard. The way you framed the issue just a minute ago required that we viewed the facts in the light, most favorable to your clients. And we cannot do that in this interlocutory appeal. Uh, no, no, your honor. I agree. And I think that the, the, uh, the only, the only really issue before the court here is whether clearly established law would have put any reasonable officer on notice that they had to go and look at someone's medical records. And that's, that's not the issue. The issue is whether clearly established law, um, clearly established law, uh, imposed the duty to protect the inmate from being assaulted by, uh, other prisoners. Yes, your honor. But under the circumstances, these individuals faced, we have a situation where there's medical information that is not in their possession. It's in the possession of a healthcare provider. That's the disputed, that's the disputed fact. You are requiring us to, to view that disputed fact in the light, most favorable to your client. We may not do that. We do not have jurisdiction to do that here. No, I agree, your honor. But, but the whole point here is I'm not disputing that it could, that it may have been available. The only question is whether they had a duty to go and seek it out. And I would just like to bring the court's attention to one case. Setting that information aside, let's say that you didn't have an obligation to look at the medical, uh, evidence, the, the other evidence, the other information that was known to the employees, the classification specialists at the jail, why wasn't that sufficient to, um, impose a duty to protect, um, the plaintiff in this case? So the medical evidence, why wasn't there enough in terms of what was actually in the files for the, uh, detention center? Well, your honor, and that's a good question. And that is because in a seven months proceeding, Mr. Lay's, uh, being placed in a cell with Mr. Meager, all of the evidence of any recent violence on Mr. Lay's behalf was in medical records in the possession of the medical. Why are you limited to seven months preceding? Why are you limiting? I mean, the, you're put on notice of everything that's in his file. Now it's not, it's not truncated to the seven months preceding everything that's in the file should have been considered by the classification offices. Do you agree? But yes, your honor. And I guess what I would say to that is that under the, under the classification system, every inmate is entitled to a second chance and they do have to be reviewed every 30 days. But not a second chance that puts other inmates at risk of serious injury or death. Well, no, your honor. But I have to, I mean, I have to emphasize that at the time this took place, uh, Mr. Lay was a 28 year old individual. He had a mental condition. Uh, he could not have been placed in isolation forever. They had to try to give him a reasonable second chance. He had not been convicted of a serious felony. Can I ask more a question of the facts? Because as I understand it, maybe this was the point you were trying to make was that the evidence of what he had done at the facility, there'd been a lapse of several months before he'd had a violent outburst. However, at the, at the mental facility, there'd been several. So I guess my question was, and I, I thought that that was in the record. And so when, uh, make sure I get his name. When officer Curtis was reviewing for reevaluation, he looked back and said, Hey, he's been, he's been fine since 2017. He hasn't had an outburst in several months. We can reclassify him at what Curtis did wrong. It seems to me is he didn't look and he testified that they would normally consider these other incidents that happened at another facility. Is there, I mean, why isn't that enough to put Curtis on, on the hook here? Well, your honor, and it's because he did testify specifically if it is available to us. Yes, we can. Okay. So that's my question. Is it undisputed that it was not available? Cause I didn't have that impression. What is undisputed your honor is that he did not ask for the information. And the whole issue in this case is whether a correction officer has a duty under the clearly established law to go into the health department and seek a specific medical record from a different facility. They have that duty. If they have access to it, help me understand that because I mean, he, he knew you might even have a stronger case if there hadn't been a prior history at the own facility, but he looked and said, Hey, there was the last outburst violent outburst at this facility was several months ago. He looks good since then. The problem was he hadn't even been at that facility since then. So why wouldn't, I mean, why wouldn't he have had a duty to say, well, what's happened in the last eight months? Your honor, the reason he wouldn't have a constitutional obligation is because it was not clearly established. And if I may make just one point here, it is still an open question in this circuit, whether a medical provider who fails to look at a medical record in a, in a, in a case involving deliberate indifference to serious medical conditions, it is still undecided here, whether that constitutes deliberate indifference or mere negligence. Now, let me ask you this. Wasn't there a transfer note from the hospital back to the detention facility, uh, detention facility, which alluded to a violent outburst and, and possibly, and I think maybe, um, attacks on staff setting the medical records themselves aside. Wasn't there a transfer note that alluded to that? Your honor, that has been not cited. I have not seen that cited anywhere in the record and that information. There's two, one's dated February 14th and one is dated April 24th, the discharge summary. And there were 1, 2, 3, 4, 5, 6. And those were sent to the jail. Right. Faxed to the jail, both of them. And there were six assaults at Western state hospital. I believe your honor, you're talking about the Western state hospital evaluation. And there is also a medical note dated August to April 24th. There were, it's written in a actual medical chart. Now that's their citation. They cite to a medical chart. Weren't there transfer, weren't there transfer notes to the jail when, when the inmate was transferred from the hospital back to the jail, there were notes that were sent to the jail, correct? Well, your honor, I believe what you're talking about is this, is this transport note. Exactly. And, and I have not, the Mr. Meagher has not cited any transport note in the record and I have not located one. The only reference to that is in a medical record for Mr. Leahy dated April 24th. Was that part of the jail records? That is part of his protected health information. That's part of his medical record. When you say protected health information, do you mean in the jail or in the hospital? I mean, in the, in the, in the healthcare provider, it is a covered entity under HIPAA and it is separate in that sense. Okay. But is it part of the records that are available to the classification? Now that's, that's, that is what the court said. To me, you're parsing out this. I'm, I'm, all I'm asking you is if, if, if the classification official went into the records that are in the jail, the documents that are in the jail records, would this document appear? Not in the records he had. No, it would not. Wait, but there is evidence in the record that the classification specialists had access. And that's why I think you keep trying to frame this as an issue of whether they had a duty to go look at the records. Hence Judge Nelson's comment, why wouldn't they? This person had been in and out. Both of them actually admitted once in the King County jails, 18 times at once in the King County jail, 20 times. And, and Mr. Lee in particular, coming back, let's just look at the, when he's coming back from Western state hospital on the 24th, he comes with a record that shows six different assaults that happened there while he was there for four months for a very extended period of time, which would raise bills right there to have this competency evaluation done. He comes back to the jail and he's, and he's classified as red, psychiatric red category, which is the most severe as I understand it. And then again, in May 23rd, that was continued. And then he was reevaluated again on June 25th, as we have been describing. So there were, there were indicators that certainly seem to me to raise a question about whether there was a duty to go look at those records. And I don't think there is a dispute that they had access. You just seem to be arguing that they weren't required to go look and yet their job is, I'm sure very difficult job by the way, I don't want to minimize it, but their job is classification specialist. That's what they do. Your Honor, a couple of points. One is on the psychiatric red. That is not evidence of violence. Okay. That is simply evidence of some instability that required him to be housed in red briefly. And as for the other part of this, what is dispute? The only dispute that judge, that the judge found below was whether he had the information available is a question of fact, we don't dispute that, but, but, but what we're trying to get across here is where is the constitutional obligation under the duty to protect? Where is it clearly established that this requires non-medical personnel to go and seek out outside medical records and review them for potential evidence of violence. And I would Curtis said that it was, it was always done. You're just saying that wasn't a constitutional requirement. That's just what they did. But he said that the hospital records was considered in classification. So they had to have gotten that in other cases. And I mean, I guess your argument is yeah, but just because they did that, that didn't impose a constitutional duty on them. But boy, it seems to me that if, if, if you have a, a, a inmate or a detainee with prior violent record, and he hasn't been at your facility for several months, aren't, aren't you, aren't you missing the boat? If you make a reclassification from the highest level to the lowest level, without even asking the question, what happened in the intervening several months? Well, you're on a couple of points on that. First of all, he was not reclassified from the highest to lowest. He was placed from restrictive housing to the highest level of general population, which is close custody. That is one. The second one is, is, is a classification specialist. Curtis testified specifically. If it is available to us, we have used it. That was his specific testimony. He did not testify is to any amounts of times he'd seen it as to who provided it to them or anything else. He simply stated, if it is available, we have reviewed it in the past. He specifically referenced an Eastern state hospital record. Now that, well, if it's available to us, but you're not disputing that it was available to them. We don't know that. We just know that we haven't even talked about the assault, the unprovoked assault on the other prisoner Sullivan that happened in the jail, not at Western state, but in the jail. That's correct. Is it your, is it your position that these folks didn't have access to the assault that had happened in this facility? No, that's not my position. Your honor. My only position is, is that that did happen. Uh, there are, it was a very violent salt. We've all watched it on video. Why isn't that enough? Well, it did happen very distant. It was, it was, uh, nine months, uh, beforehand. And, and, and, you know, this inmate was entitled to get a second chance. He cannot be left in isolation for six or seven months on end with a mental condition, or we would be here on a case. Well, but that that's part of the issue is he, he wasn't left there for six or seven months because he was at the hospital. So, I mean, I think in other contexts, your argument might have some weight. I just don't see how it applies here. Well, I guess, I guess your honor is that the point we're trying to make and drive home here is, is, is whether really the law was clearly established that these guys had to go look at protected health information. And I think the you're framing the issue is not really accurate in my view. I, I, I just think the information that was already available to the classification office should have put them on notice that it would be a risk to put this, a violent offender in with another mentally challenged inmate or detainee who was much smaller than he was. That was the other issue as well. He was put in with someone who was much smaller than he was. And there was also the information that he asked that the, the victim of the assault asked to be moved and he wasn't moved. Well, your honor, we haven't talked about officer Garcia yet. Do you want to speak to that? Well, yes, your honor. And I'll speak to it briefly. First of all, there is no evidence that officer Garcia had any notice whatsoever of any problems between Mr. Meagher and Mr. Lay. Officer Garcia worked one shift, one shift. Counsel, counsel, counsel, this is the officer, unless I've got the defendants mixed up, this is the defendant we're speaking of who received the buzzer call was on the other end intercom when Mr. Meagher said that reported that he and his cellmate weren't getting along. Yes. How do I reconcile that with the statement you just made, please? Okay. Well, I guess what I was saying, your honor, is did he have any notice before July 15th, that there were any concerns between those inmates? And the answer is no, you are correct. Wasn't the policy that if someone indicated that they weren't getting along with their inmate, there was supposed to be some type of investigation or something to, to determine whether or not one or one or both should be moved. Wasn't that the policy? Yes, your honor. And in the undisputed evidence, what it indicates is that at the time he pressed his buzzer, they were in the process of moving an inmate out of a cell in the same pod who had expressed suicidal ideations. He was, he was talking about suicidality. They were in the process of taking that inmate out of that cell. Mr. Meagher sees it through the window and buzzes him right at that time. They're trying to move this inmate out, get him into a place where he can be evaluated. And he asked him, can I move to that cell? We're not getting along. Specific language. Officer Garcia did not do nothing. He got on his computer. He looked, there was still indicated that this inmate was not formally transferred yet. So what he did is he said, I can't move you there right now. But what I, what I will do is pass this on. I'm off in a half an hour. And within a half an hour, this incident had happened. Now, there's also, you've left out the part. Tell me if I'm wrong. I'm mixing up the record. This is your opportunity. But I think there's also an indication that got officer Garcia surmised, suspected that the reason for the call was to try to score a different cell. We'd have better view to the television set. And then this, this discussion that we're talking about, this report through the intercom wasn't in his first report, but he went back and corrected the record, which I appreciate, but it happened a few days later, right? Yes. Yeah. And he did, he did that. He did say that that thought about the TV passed through his mind, but, but objectively he still checked and he still saw. Objectively what you're doing again, I think respectfully, sir, is asking us to construe the facts in light, most favorable to your client. And we just not able to do that. You may win on this issue, you know, later, but we're out here on an interlocutory review, as you know, and we can't view the facts that way. No, I agree. You cannot view any disputed facts in a light most favorable to us. I'm just saying it is undisputed that he went on the computer. There's no question that he did look at that's not a disputed fact. And it's not, but there's also, there's also other indication in the record about the reason that the, the request for help wasn't honored having to do with the television and having to do with, yes, you're right. That's true. Okay. All right. Thank you, counsel. You've exceeded your time. We'll give you a minute for rebuttal. Thank you. We'll hear from Appley. Thank you, Your Honor. Good morning, Your Honors. My name is Felix Luna and I represent the Appley, Mr. Meagher. Your Honor, I'd like to start off with the issue of jurisdiction, which appellate courts like yourselves examine in almost every case. And this circuit has made it clear that an interlocutory review of an order denying summary judgment on QI grounds is an exceptional remedy available only if the issue of immunity is presented as a question of law. And as been demonstrated today, there are numerous issues of material fact, as was found by Judge Robarts on the issue of qualified immunity. Right, but we hear qualified immunity cases frequently. We just construe the facts in light most favorable in this case to your client, and then we go from there. So that's what would be helpful to us. Okay. So just ask about what would be helpful for me. I think that, well, Garcia is what sticks out of my mind, because it's not clear to me that it's a constitutional violation. Given all the facts to your client, he gets a call that says, I'm not getting along with my inmate or with my cellmate. Why does that rise to a constitutional level? I mean, I'm assuming guards could get those calls all the time. Were there other facts in there that he somehow knew of the violent tendency of Leahy? I think it's pronounced Leahy. So is there evidence that he knew of the other violent tendencies of him? Because it does strike me as a little harsh to say that he could be constitutionally liable just because he got a call. I mean, he may have violated policy. He may have done a lot of things, but just there was no, I'm about to get beat up. I feel threatened. He just said, I'm not getting along. So what's your best case for why that rises to a constitutional level? Sorry, I think it's the Clem decision from this court in 2010, which involved a situation. It was an eighth amendment case. But in that case, an inmate contacted a jail guard and said, I'm having an issue, or there's a problem with my cellie. The guard did not react. And then the inmate was assaulted. And this court held that that was a constitutional violation. I don't think it went up on QI, but the right to be protected under very similar facts was in Clem. And if you look at, if you construe the facts in the light most favorable to Mr. Meagher, he had been complaining for days about fear of Mr. Leigh. According to that. And was there evidence that Garcia knew about that? You know, you should have known about that. We believe under the Castro decision, which is a no or should have known standard. Castro makes it an objective test. As you know, it's not only what the officers knew, but what they should have known. And I agree. That's why I asked the question that way. But it's not a collective knowledge, meaning if anybody in the jail knew, then we're going to impute that to him. But the question is, should Garcia have known? And what evidence was there that Garcia should have known that? Your Honor, it's unclear. And I'm not familiar whether he had worked the previous days in that particular unit or not. But under Clem, that was a single expression of concern. And in that case, the right was recognized. So I don't think we need to have a whole bunch of information on this. And to the point that was raised earlier, under the policy of King County. Would it have changed it if he said, hey, we're having a political, we're having a discussion, we're disagreeing about this political view. I need to move because he's making me uncomfortable with I mean, would that have changed it? Because I'm not sure that as an officer, I'd be thinking, oh, my gosh, this guy's about ready to get beat up. I got to get him out of there quick. Your Honor, if it was presented by two folks of the same size who didn't have mental health issues with a person who hadn't had a long history of violence that could be easily checked, perhaps that would not be enough. We disagree about the election. We disagree about the Mariners. And I'm not comfortable. I'd like to move. Your Honor, that's not our case. But you know what, if that were the facts, it may not satisfy the Clem standard. And in Castro, there was also in Castro where Mr. Castro banged on the cell and asked for help. And so if you take Mr. Meagher's version of the facts, he testified, I was I needed help. I've been concerned for days. I'm asking for help. So if you accept the facts in Mr. Meagher's favor, you have Clem, which is 2010 and Castro. In Castro, that was another situation where Mr. Castro banged on the cell and asked to be helped. And he wasn't. He was assaulted in the officer's that that issue went to trial. So I think you have those counsel. Do we have cases that said violation of policy may be considered in making the deliberate indifference determination? Your Honor, if you look at Castro, one of the issues in Castro was a jail policy that precluded the placement of felony arrestees, particularly those in that case where somebody was combative with folks arrested for public intoxication. That was thoroughly discussed in Castro as a basis for the claim. And there are other decisions as well, Your Honor. But I think you don't have to look past Castro for a policy based to rely on policy and the fact that Castro included a code violation where there wasn't proper communication ability. Well, in Castro, Your Honor, there was a couple of things. First, it was a felony arrestee who had been combative and there was a code and a policy that precluded the housing together of those types of arrestees. And so they violated that as well. Right. But I'm asking a different question. I'm just not asking it very well. My recollection in Castro and I've got it right here, but my recollection is that there was a violation of the code as in the building code and that you didn't have the proper intercom available. Is that right? Am I misremembering that? Your Honor, my memory of the of the issue, the policy violations had to do with housing them together and that what they should have done was house them separately and other cells were available. I'm not disagreeing with you. I'm just not familiar with an issue about the intercom. I think the intercom was working, but somebody was asleep or not paying attention. And so that I think that your comment, your recollection, maybe it doesn't matter. I can certainly re-review the case is that the volunteer went running for help and specifically had to go running for help because the intercom wasn't working. And yes, and there was some delay anyway. Okay. And so I think the court doesn't have to look past Castro to decide this case and affirm Judge Robarts ruling that there were issues of fact on the QI question. And I think your honors went over all of the disputed facts. I don't want to, I don't think I need to do that again. You did a phenomenal job and I don't want to undermine that point because there's many facts here. One, a couple of things I'd like to address that Mr. Zeldin must raise about this being protected health information. That's just not accurate. HIPAA, this is not protective health information because it's in a jail facility and it relates to safety. And the defendants themselves admitted that. So they had, oh, sorry. I'm sorry. They're not, he was clear. He's opposing counsel's not contesting access to. No, but he called it protecting. He's contesting duty to go look. That's different. I agree with that. But the point is, is they had a duty to protect Mr. Meager. They were on notice of a potential violent inmate who was large and unpredictable, particularly when he wasn't on his medications. And that information was in the jail. And one thing that I think is important is. Can you clarify what was available to them, to Mr. Curtis specifically? Was it that he had to go log in to a different computer and check the health records? Or was there something in the prison records that would have alerted him to what had happened over the previous several months at the hospital? Okay. So there was the transport document that was raised by Judge Rawlinson. What Mr. Curtis would have done, had to do, is what he did regularly, which is pick up the phone and talk to jail health services and say a question like, this guy just got back from state. The last time he was here, he assaulted violently Mr. Jeremiah Sullivan. How did he do there? And jail. Counsel, counsel. So to answer Judge Nelson's question, it's not the case that that Mr. Curtis could have gone onto his screen and clicked on the tab to get to that health information. He would have had to pick up the phone. Is that right? I don't know if he could look in the computer, your honor. But the point is, is the way they exchange information was verbal and the jailhouse services representatives have testified that they regularly communicate verbally with the classification folks and vice versa about this information. Was there a policy on that? I mean, Curtis, his testimony was that they relied on the hospital information to make the classification decisions. But did he go further than that? Was that, was the policy only if we knew about it? Or was the policy, hey, if you get them back from the you know, you've got to go look at what their history was at the hospital. So yes, there was a policy and it was discussed where the CPSs are required to work in consultation with jailhouse services and to consider an inmate's aggressive behavior history. So, and then it was, it was the practice. So the 30B6 designee, Mr. Curtis himself, they had a policy and a practice that was regularly followed where they would consult with each other about these types of inmates in order to keep other inmates safe. In jailhouse services. Why did that, did Curtis ever give an explanation why that didn't happen? Because Curtis seemed to be pretty honest, you know, and upright. And it just seems like this was a mess. I don't think it was intentional. I mean, that's not for me to decide, but I just wonder what, what happened here. It just seems to be a breakdown in what they normally would have been doing. Your Honor, I think it was that Mr. Curtis had an obligation to protect Mr. Meager from assaultive behavior of Mr. Leahy. And everybody agrees with that. What he did was he had a 10 minute interview at the cell of Mr. Leahy. And he said, how are you doing? Are you going to behave yourself? And Mr. Leahy said, yes, even, and he took it instead of picking up the phone like he normally does. And the point you're on is we're not suggesting they do something novel or something different or something new. It's what they did all the time. And he did this guy's tell him he's going to behave himself. If he picked up the phone, he would have been told Mr. Leahy had assaulted six people or more at Western state hospital. He would have known of the transport order. He would have known and found out that Mr. Leahy was not complying with his antipsychotic medications, which made him more volatile and more susceptible to violence. All he had to do was pick up the phone and he failed to do so. And we believe that creates a jury question about whether that's reckless disregard for the health and safety of Mr. Meager. Can I ask a question? Would the damages or the relief available to your client be any different if Curtis and Pryor were the only defendants and as a defendant, add to the potential damages that are recoverable? It does not add to the damages, Your Honor. Mr. Meager's compensatory damages are going to be set by what the jury determines to be his harm. But we are under 1983, we're entitled to punitive damages. And I think it's a jury question about whether Mr. Garcia, especially in light of Clem and Castro, he hears, I'm having a problem with this large, potentially affirmatively violent inmate, and doesn't act. And when the policy says, according to Major Clark and... Well, and just to be clear, though, I mean, the testimony was, the statement was, they weren't getting along. I mean, I think I would be more inclined if it went further than that. But I don't know. It's an open question for me whether we weren't getting along is enough to impose a constitutional duty to get him out of there. Did he have a visual? Could he see inside the cell or was he just hearing an audible? He couldn't see. I'm a little concerned about this much smaller inmate needing to report an audible concern within earshot of this much, much larger guy. So there's sort of that dynamic going on. I'm just wondering, did Curtis have the ability to look in there? When the call came through, he was at the station, and so he did not have the ability to see. But he knew how large Mr. Leahy was because he'd been, they come into a common area. They're not always in their cells. So he knew the size differential. And back to your point, Judge Nelson, I think you raise a very good point. If we accept the facts in the light most favorable to Mr. Garcia, but Mr. Meagher describes it as, I'm worried, I'm concerned about this inmate. And it was discussed in the depositions that when you're in a cell, and you're intimidated, and you make this call, the other person's right on your shoulder. You're going to be a little careful about how you make this comment. Because if you get up there, he's going to get, from Mr. Meagher's perspective, Mr. Leahy is a lot closer to him than Mr. Garcia is to that door. And Mr. Garcia, they all recognize that in jail, they have to be a little circumspect about the way they communicate. And so when Mr. Meagher says, I'm having a problem, Mr. Garcia, at least it's a fact issue, knows what that really means. And Mr. Meagher says, I had been complaining, and I was letting Mr. Garcia know that I'm afraid of this person in the best way I could while trying to be protected from what ended up happening to him. So I think, Judge Nelson, as you talk about, if it's a political discussion, if it's just, I'm having a problem, that is accepting the facts in Mr. Garcia's favor and not- But your statement is that there's enough of an inference to get to the jury with, we weren't getting along, that that was a red alert. That wasn't just saying, hey, I lost a game of checkers, and now he's angry. I mean, there was an inference that it should have a much higher warning. Yeah, particularly in view of the policy and the fact that Mr. Garcia came back later and put that into his report, that implies that there was some significance to that. And Mr. Garcia, the record is clear that the policy would have required him to separate and investigate. Major Clark said that, that's really not in dispute by the defense. I see my time is up, Your Honors, and I just ask that- One point, if I could ask one more question, just related to that point. On July 12th, three days earlier, Meagher was evaluated by a psychiatrist and told him about his difficulties, and opposing counsel has done a really good job of indicating that, but he declined to be reselled at that point. My only question specific, on the day of the assault, did Garcia have, Officer Garcia, have access to that July 12th entry? It's unclear, Your Honor, I don't know. Okay. I don't know if he had access to that. And so, as this discussion, I believe, confirms, there are issues of fact on the QI question, and we respectfully request that the court affirm Judge Robach's denial of summary judgment on QI. Thank you, Your Honors. All right, thank you, Counsel Roboto. Yes, Your Honor, a couple of points. The Klim case involved a specific threat of harm. Words matter. It's not this case. Well, what was the specific? Just remind me, because I thought it was pretty generic there, too. Well, Your Honor, my understanding of Klim, and I just read a bullet point of it, but there was a threat. There was a threat of harm involved in that case. Well, there might have been a threat of harm, but what was communicated to the prison? Well, my understanding is that the guard was made aware that there had been a threat, and that he did not intervene and do anything about it. He told a jail official who did nothing. So, he knew of a threat to that specific inmate, and he didn't take any action. So, that's my understanding of Klim. You know, Castro involved... Counsel, does it really matter at the end of the day for your client whether we leave Garcia in? I mean, granted, we don't want to leave individuals in who shouldn't be unliable, but at the end of the day, for the relief, does it really matter whether there's two or three defendants here? Yes, it does, Your Honor, because these are constitutional tort violations. These are one point, if I may, Your Honors, and that is, it is still not clear in this jurisdiction whether a physician who has absolute unfettered access to a patient's medical chart is liable for deliberate indifference because that person doesn't look at a medical record. Now, if that's the case, how on earth could a non-healthcare-related individual be deliberately indifferent as a matter of law for the same issue? Well, because it's not the same, factually. These folks are charged with making a really tough call under, you know, tinderbox circumstances to classify people and protect inmates from, under our law, from violence by other inmates. I would agree, Your Honor, but I'm just trying to say that the act or the omission and the standard of deliberate indifference are identical in the two situations I just mentioned. If a physician doesn't look at a medical record and he provides constitutionally inadequate care, the law is that's not deliberate indifference. We understand that. We understand this is a different circumstance. We're talking specifically about violence by one inmate against another, and our law for that circumstance is Castro. Your Honor, yes, but I'm just saying that I don't believe it is clearly established that that's what they had to do in this case and that any reasonable officer would have known they had to go look at a record from an outside facility and scan it for some evidence of violence in that facility. Now, was it an oversight? Could it be construed as possibly negligence? Not, you know, mistakenly not going and looking at a record, a medical record? Possibly. Right, and that really gets to the final point that I'll just leave you with, which is that in some of the medical malpractice cases in prison, it's just medical malpractice. It's just negligence. It doesn't rise to the level of deliberate indifference, and it remains to be seen in this case whether this will rise to the level of deliberate indifference as well, but those are factual issues. All right, thank you, counsel. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court that completes our calendar for the day and for the week. We are adjourned. Thank you, judges and council members. All rise. Fifth court for this session stands adjourned.
judges: Rawlinson, Christen, R. Nelson